**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**RAY M. FIELDS,**

      **Plaintiff,**

**vs.**                    **Case No.  4:13cv168-MW/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner, Social Security
Administration,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Acting Commissioner (Commissioner) of the Social

Security Administration (SSA) denying Plaintiff's applications for a period of disability

and Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and

for Supplemental Security Income (SSI) under Title XVI of the Act.  After careful

consideration of the record, it is respectfully recommended that the decision of the

Commissioner be reversed and remanded.

## I.  Procedural History

On September 1, 2010, Plaintiff, Ray M. Fields, filed applications for a period of

disability and DIB and SSI, alleging disability beginning on April 4, 2010.  R. 24, 186-93,

207. (Citations to the record shall be by the symbol "R." followed by a page number that appears in the lower right corner of each page.) Plaintiff's date last insured, or the date by which his disability must have commenced to receive DIB, is September 30, 2015. R. 24, 205; *but see* R. 207, 246 (December 31, 2014 (date last insured)).

Plaintiff's applications were denied initially on January 21, 2011, and upon reconsideration on August 2, 2011. R. 24, 83-100, 128. On or about September 8, 2011, Plaintiff requested a hearing. R. 24, 130-31. On March 23, 2012, Plaintiff's representative, Edward A. Swierczek, a non-attorney, provided the Administrative Law Judge (ALJ) with additional medical information. R. 111-20. Mr. Swierczek, stated, in part, that that "[t]his is an excellent case for an on-the-record decision." Several impairments are mentioned and a finding of disability at step five was requested as Plaintiff "is limited to less than a full range of sedentary work." R. 111. On May 14, 2012, Mr. Swierczek provided the ALJ with additional medical information from S. John Suss, M.D., a physical capacities evaluation of April 17, 2012, and a residual functional capacity (RFC) assessment of April 23, 2012. R. 122-26; R. 141-46 (Swierczek July 11, 2012, letter with additional medical records).[1]

On August 20, 2012, a video hearing was conducted by ALJ Frederick McGrath, with the ALJ presiding in Atlanta, Georgia, and Plaintiff and his roommate, Roger Cable, appearing in Tallahassee, Florida. R. 24, 71-81. Plaintiff was represented by Mr. Swierczek, a non-attorney. R. 24, 101-02. (The transcript of the hearing indicates that Plaintiff was represented by John Grohmann, an attorney. R. 68-69.)

---

[1] The records include Dr. Suss's physical capacities evaluations and mental RFC assessments dated April 17 and 23, 2012, R. 361-67 (Exhibit 6F), and June 8, 2012. R. 587-93 (Exhibit 26F). The ALJ referred to both. R. 36.

On September 10, 2012, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from April 4, 2010, through the date of his decision.[2]  R. 24-37.  On December 14, 2012, Plaintiff requested review of this decision and submitted a letter/memorandum in support.  R. 18, 302-03 (Exhibit 20E).  On December 28, 2012, the Appeals Council denied Plaintiff's request for review.  R. 7-9.  On January 30, 2013, the Appeals Council set aside its earlier determination and considered Plaintiff's correspondence of December 14, 2012, and again denied Plaintiff's request for review.  R. 1-5.  The ALJ's decision stands as the final decision of the Commissioner.  20 C.F.R. § 404.981.

On April 1, 2013, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  On May 28, 2013, an Answer was filed.  Doc. 8.  On August 29, 2013, Plaintiff filed a memorandum, doc. 15, and new evidence, doc. 15-1.  On September 30, 2013, Defendant filed a memorandum.  Doc. 16.  Both memoranda have been considered.

## II. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

---

[2]  There is an identical decision in the record dated September 7, 2012.  R. 44-66.  Citations are made to the September 10, 2012, decision.

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

---

[3] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[4]

Both the "impairment" and the "inability" must be expected to last not less than 12

months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled

to DIB if she is under a disability prior to the expiration of his insured status. *See*

42 U.S.C. § 423(a)(1)(A); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136,

1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96,

97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the RFC to perform work despite limitations and are any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits. A positive finding at step three results in approval of the

application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

---

[4] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

not disabled.  If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the

Commissioner carries this burden, the claimant must prove that he or she cannot

perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

    As the finder of fact, the ALJ is charged with the duty to evaluate all of the

medical opinions of the record resolving conflicts that might appear.  20 C.F.R.

§ 404.1527.  When considering medical opinions, the following factors apply for

determining the weight to give to any medical opinion: (1) the frequency of examination

and the length, nature, extent of the treatment relationship; (2) the evidence in support

of the opinion, as "[t]he more a medical source presents relevant evidence to support an

opinion, particularly medical signs and laboratory findings, the more weight" that opinion

is given; (3) the opinion's consistency with the record as a whole; (4) whether the

opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other

relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

    The opinion of the claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of your medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations or brief

hospitalizations." 20 C.F.R. § 404.1527(c)(2). "This requires a relationship of both

duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). "'The

treating physician doctrine is based on the assumption that a medical professional *who*

*has dealt with a claimant and his maladies over a long period of time* will have a deeper

insight into the medical condition of the claimant than will a person who has examined a

claimant but once, or who has only seen the claimant's medical records.' *Barker v.*

*Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication than an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must

be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must

specify what weight is given to a treating physician's opinion and any reason for giving it

no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work

if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v.

Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ

may discount the treating physician's opinion if good cause exists to do so. Hillsman v.

Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a contrary finding,"

the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight,"

the opinion is "inconsistent with [the treating physician's own medical records," the

statement "contains no [supporting] clinical data or information," the opinion "is

unsubstantiated by any clinical or laboratory findings," or the opinion "is not

accompanied by objective medical evidence." Lewis, 125 F.3d a1436, 1440 (11th Cir.

1997); Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.

1987)). Further, where a treating physician has merely made conclusory statements,

the ALJ may afford them such weight to the extent they are supported by clinical or

laboratory findings and are consistent with other evidence as to a claimant's

impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The credibility of the claimant's testimony must be considered in determining if

the underlying medical condition is of a severity which can reasonably be expected to

produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After

considering a claimant's complaints of pain, an ALJ may reject them as not credible.

See Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir.

1984)); <u>Moore v. Barnhart</u>, 405 F.3d at 1212 ("credibility determinations are the province

of the ALJ").  If an ALJ refuses to credit subjective pain testimony where such testimony

is critical, the ALJ must articulate specific reasons for questioning the claimant's

credibility.  *See* <u>Wilson</u>, 284 F.3d 1225.  Failure to articulate the reasons for discrediting

subjective testimony requires, as a matter of law, that the testimony be accepted as

true.  *Id.*  On the other hand, "[a] clearly articulated finding with substantial supporting

evidence in the record will not be disturbed by a reviewing court."  <u>Foote v. Chater</u>, 67

F.3d 1553, 1562 (11th Cir. 1995).

Pain is subjectively experienced by the claimant, but that does not mean that

only a mental health professional may express an opinion as to the effects of pain.  One

begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

<u>Wilson</u>, 284 F.3d at 1225; *see* <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); 20

C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e)

(regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to

evaluate the claimant's subjective pain testimony because it is the medical model, a

template for a treating physician's evaluation of the patient's experience of pain.[5]

## III.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

---

[5]  Although the ALJ did not expressly refer to the three-part part standard, it is
clear that the ALJ's findings, discussion, and citation to 20 C.F.R. §§ 404.1529,
416.929, R. 30, indicate that the pain standard was applied.  <u>Wilson</u>, 284 F.3d at 1226.

1. "The claimant meets the insured status requirement of the Social Security Act through September 30, 2015." R. 26, 205; *but see* R. 207, 246 (December 31, 2014 (date last insured)).

2. "The claimant has not engaged in substantial gainful activity since April 4, 2010, the alleged onset date." R. 26;

3. "The claimant has the following severe impairments: degenerative joint disease of the right knee; history of bilateral lower extremity varicosities; bilateral foot osteoarthritis; diabetes mellitus; and obesity." *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 27. The ALJ considered Plaintiff's physical and mental impairments in light of several listings including Listing 1.00 et seq. (Musculoskeletal System); 9.000 et seq. (Endocrine Disorders); and 12.00 et seq. (Mental Disorders). R. 28. The ALJ determined that Plaintiff had *mild* restriction in activities of daily living; *mild* difficulties in social functioning; *mild* difficulties in concentration, persistence or pace; and *no* episodes of decompensation which have been of extended duration. R. 28-30.

5. "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he requires a sit and/or stand option; he can sit for no more than 1 hour at a time; he cannot climb ladders, ropes and/or scaffolds; and he cannot be exposed to unprotected heights and dangerous machinery." R. 30.

6. "The claimant is capable of performing past relevant work as a short order cook (DOT# 254.29-5047). This work does not require the performance of work-related activities precluded by the claimant's [RFC]." R. 36. The ALJ found, "[c]onsistent with conclusion of Disability Determination Services upon reconsideration," that Plaintiff "is able to perform the physical and mental demands of his previous work as actually and generally performed (Exhibits 6E; 12E)." R. 36.

7. "The claimant has not been under a disability, as defined in the Social Security Act, from April 4, 2010, through the date of [the ALJ's] decision." *Id.*

## IV.  Evidence

### A.  Plaintiff's Background, Work Experience, and Daily Activities[6]

Plaintiff graduated high school and has past relevant work experience as a short order cook.  Plaintiff was arrested, served time in prison, and received 10 years' probation for forging several checks in 2009.  R. 326, 344, 437.  Plaintiff had similar forgery charges pending 2011.  R. 326.  In 2010, he applied for disability benefits. R. 186, 190.

Plaintiff maintained a close relationship with a friend, Mr. Roger Cable, with whom he lived.[7]  R. 29, 226, 344.  Mr. Cable filled out a third-party function report in September of 2010.  R. 81, 226-33 (Exhibit 4E).[8]  Generally, Mr. Cable stated that Plaintiff had no problems with personal care, although he was in pain most of the time and some days were worse than others.  R. 227.  Mr. Cable noted, however, that Plaintiff needed help with meal preparation if cooking was involved.  R. 228.  Plaintiff did no lawn work.  Plaintiff washed dishes and wiped the counter tops.  *Id.*  He had problems with lifting, squatting, and other mobility issues.  He could walk 100 feet before resting, resume walking in ten minutes, and pay attention for 30 minutes.  He did not read well.  R. 231.  He got along with authority figures.  He did not walk well,

---

[6]  The ALJ may consider a claimant's daily activities when evaluating the claimant's subjective complaints of disabling pain and other symptoms.  <u>Macia v. Bowen</u>, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

[7]  Plaintiff testified that he has known and lived with Mr. Cable off and on for five years.  R. 71.  Mr. Cable confirmed this statement.  R. 79.

[8]  The ALJ considered Mr. Cable's statements, but afforded his opinion of Plaintiff's functional limitations "little weight."  R. 36.

watched television all day, talked to his mother, used a wheelchair when shopping, used a cane, and wore glasses or contact lenses.  R. 232; *see* R. 280 (Disability Report)).

Plaintiff reported (with his roommate Mr. Cable) in an October 2010 Function Report , R. 241 (Exhibit 5E), *see* R. 28-29, 31-32,  that he performed his own personal care needs, although he sometimes needed help with bathing and getting on his feet. He prepared his own meals, cleaned, washed dishes, vacuumed, cleaned, did laundry, and shopped for groceries and clothing.  He called his mother three or four times a week.  R. 28, 234-38, 452.  Plaintiff disclosed no problems getting along with authority figures and no difficulty getting along with friends, family, and others, except for his father.  He reported that it hurts when he squats and his legs hurt when he bend and he had other mobility problems.  He cannot read well.  He can walk 150 feet before stopping to rest and can resume walking in 15 minutes.  R. 239.[9]

Mr. Cable also filled out and signed a Function Report on March 31, 2011. R. 260-67 (Exhibit 10E).  Mr. Cable reported Plaintiff needed help with personal care. R. 261.  Mr. Cable prepared the meals; Plaintiff did the laundry sometimes, but needed help because he could not walk and get up.  R. 262.  Plaintiff did not drive and he did not go outside much because his leg hurt.  R. 263.  He can sometimes pay bills and can count change.  Plaintiff watched television.  He talked to his mother.  He needs to be reminded to go places and be accompanied.  R. 264.  He had problems lifting, squatting, and understanding, and other mobility issues, but he did not note problems with seeing, talking, stair climbing, memory, concentration, and following instructions. R. 265; *see* R. 30.  He cannot walk well.  On a separate question, Mr. Cable wrote that

---

[9]  The ALJ considered Mr. Cable's statements, Exhibits 5E and 10E (below). R. 28-29, 31-32.

Plaintiff does not follow written instructions at all and follows spoken instructions half the time.  R. 265.  Plaintiff does not get along with anyone.  R. 266.  He used a wheelchair, cane, hearing aid, and wore glasses.  R. 266.  Mr. Cable ultimately reported on Plaintiff's behalf that he needed help.  R. 267.[10]

At step three, the ALJ considered Plaintiff's activities of daily living and determined that Plaintiff "made inconsistent statements regarding his ability to complete daily activities" and stated:

> The claimant reported that he had no restrictions completing activities of daily living upon presentation of his consultative examination [with Dr. Ronal E. Smith, Ph.D., a psychologist, R. 433, *see* R. 346 (same)] in July 2010; however, the claimant subsequently reported difficulties managing activities of daily care, hygiene, and grooming to Social Security personnel in October 2010 and March 2011 (Exhibit 12F compared to 5E and 10E).  While the above referenced inconsistencies may not have been the product of a conscious attempt mislead on the part of the claimant, they nonetheless undermine his credibility in reporting activities of daily living.

R. 28; *see* R. 32, 34 (ALJ noting additional inconsistencies regarding Plaintiff's functional abilities and severity of alleged symptoms).

## B.  Plaintiff's Hearing Testimony[11]

At the beginning of the hearing held on August 20, 2012, Plaintiff's representative provided an opening statement, summarizing Plaintiff's case.  R. 70-71.

During the past 15 years, Plaintiff testified he worked as a fry or grill cook, picking up baskets.  He stood on concrete while working.  R. 71-72.  On April 4, 2010, the alleged onset date, Plaintiff explained that his legs "locked up," presumably when working, and he had to "drag it."  He received an injection and tries "to do it" but he could not do any more standing on his feet because his leg "locks up" and he has to

---

[10]   The ALJ considered Mr. Cable's statements.  R. 28-29, 31-32; *see supra* nn. 7-8.

[11]   The ALJ refers to Plaintiff's testimony in his decision.  R. 29, 31-33.

drag it so he is unable to stand. He was discharged because he could no longer "do the job." R. 72.

Plaintiff testified he never used marijuana, but used cocaine in the past, "probably about 10 years maybe off and on."[12] R. 72-73. He attended an inpatient rehabilitation program at Meridian in Gainesville, Florida, for 90 days. He went to mental health, attended class, and Narcotics Anonymous. He has not used cocaine since then. R. 73.

Plaintiff is unable to drive because of problems with his feet and hands--he cannot grab the steering wheel. He has not driven for a year and a half. Rather, Mr. Cable drives. R. 73.

Plaintiff stated that he does not prepare meals at home because his arthritis will not let him "open stuff." R. 74. Plaintiff is taking "eight different medications" and two for arthritis. He is unable to clean his home because he cannot grab anything. When he gets up in the morning, his feet are worse--it is like walking on glass--and it takes him about 20 steps to get mobile. He can bathe himself, and sometimes tie a shoe and put on a shirt, but Mr. Cable "does it because [his] hands won't function." *Id.* Plaintiff reiterated that Mr. Cable ties his shoes for him; fixes his meals because he cannot open anything. He "just takes care of [him] because of [his] back and [his] feet [he is not] able to do that." R. 76. Plaintiff cannot bend. He can walk about 20 feet sometimes. He will walk to the mailbox and his leg gives out. *Id.*

---

[12] Dr. Franklin, who examined Plaintiff for a disability determination, *see infra* at 25-26, provided several impressions, including "[i]llicit drug abuse, specifically MARIJUANA." R. 454.

Plaintiff described his challenges growing up, such as he wore a hearing aid in grades first through sixth. The teacher used a microphone and talked to him. He never learned the sound of words and at 50 years of age, states that he does not know his "A, B, C's because nobody taught [him] the sounds and so all through [his] life [he] struggled with that because of [his] education." R. 75. He was not able to follow instructions at work. *Id.*

At one time, Plaintiff worked as a mail room clerk taking boxes off a truck and pulling the paper off and matching them with a number and stapling it together and placing it back in the box. He went by number only and did not have to read anything else. R. 75. At that time, he could lift about 50 pounds, "but the boxes came on a pallet and [he] would just pick them up with a hanger." He could not do this now. R. 76. Plaintiff also worked for Filene's Basement and hung clothes on a rack. R. 75; *see* R. 297 (Summary of Plaintiff's Work Background)).

At the time of the hearing, Plaintiff stated that he was receiving psychological counseling from Dr. Smith and medical treatment from Dr. Suss. R. 77-78.

Over the past 12 months or year, he has "gotten worse and the worst part is [his] hands and [his] feet. R. 77. He has arthritis in his hands, going to his knuckles, and also in his back and feet. *Id.* He stated that he is easily distracted. He is embarrassed because of his disability and inability to read. This situation makes him nervous. *Id.*

Plaintiff is being treated for depression. He grew up in an abused family. His brother committed suicide in front of him when he was 16 years old. He has flashbacks of being abused and molested. R. 77-78. He has not looked for work since April 4, 2010 "because [he] can't do no work." R. 78.

Mr. Cable also testified during the hearing.  R. 78.  He confirmed what Plaintiff said regarding his assistance to Plaintiff.  R. 78-79.  He has known and lived with Plaintiff for five years.  Plaintiff spends most days in bed and will call him to go to the bathroom.  R. 79.  Plaintiff's days are about the same.  Plaintiff has no hobbies or recreational activities.  Plaintiff appears to be depressed.  R. 79-80.  Plaintiff appears to be in pain "[a]ll the time."  R. 80.  He never saw Plaintiff use marijuana or recently use cocaine--it "was a long time ago."  R. 80-81.  Mr. Cable drove Plaintiff to the hearing. R. 81.  Mr. Cable filled out a third-party function report.  *Id.*; *see supra* at 11-13.

### C.  Relevant Medical Evidence Prior to and After April 4, 2010, the Alleged Onset Date

On July 28, 1992, Plaintiff was examined at Hearing Associates, PC, in Libertyville, Illinois.  R. 370.  Plaintiff's main concern was a recurring ear infection over the past five years.  *Id.*  Audiogram results indicated, in part, for the right ear, mild sloping to moderately severe mixed hearing loss across frequencies and speech recognition was excellent at 96% and, for the left ear, mild to moderately severe reversed saucer-shaped mixed hearing loss and speech recognition was also excellent at 96%.  *Id.*; *see* R. 27.  During a September 22, 1992, audiogram, speech recognition was 100% in both ears.  R. 373.  In October 1992, Plaintiff underwent a right tympanoplasty and reconstruction of the ossicular chain.  Surgery was performed by William M. Gatti, M.D.  R. 376-78.  Dr. Gatti's impression included conductive hearing loss of the right ear; rule out ossicular chain dysfunction; and central perforation of the right ear.  R. 377.  Plaintiff followed-up with Dr. Gatti.  In 2000, Dr. Gatti noted that Plaintiff underwent right revision ear surgery at Loyola in 1999 and the right mastoid cavity was clear without any evidence of infection.  Plaintiff was treated for

temporomandibular joint problem.  R. 380.  Plaintiff saw Dr. Gatti on January 14, 2002,

because of drainage from the right ear.  R. 381.  He was placed on medications, ear

drops and Cipro, and recommended to follow-up in one to two weeks.  *Id.*  The ALJ

refers briefly to Dr. Gatti and the early audiogram results.  R. 27.  Plaintiff reported his

ear surgeries to Ronal E. Smith, Ph.D., in July 2010 during a consultative examination,

reporting his last surgery in 2007.  R. 343, 436.

    In 2007, Plaintiff was diagnosed with moderate tricompartmental arthrosis of the

right knee, although there was no evidence of fracture, dislocation, or subluxation.

R. 400.  In June and July 2007, Plaintiff voluntarily presented to Meridian Behavioral

Healthcare, Inc., in Gainesville, Florida, R. 73, 382-83, and for substance abuse

(cocaine/crack addiction) treatment.  R. 384-94.  He reported ear pain and drainage

problems.  *Id.*  He also reported using crack cocaine daily for the last five months.  *Id.*  It

is noted that Plaintiff had no prior substance treatment, no medications, no

hospitalizations, and no suicide attempts.  R. 386-87.  Plaintiff was recommended for

residential therapy for no less than 28 days.  R. 392-93.  An undated discharge

diagnosis stated cocaine dependence.  R. 388.  The discharge follow-up plan indicated

Bridgehouse Residential.  *Id.*  (Plaintiff reported to Dr. Smith that he attended a

residential treatment program for 110 days in 2007.  He had relapsed, but had reported

being clean for four months when examined by Dr. Smith in July 2010.  R. 343, 436.)

    On June 5, 2009, Plaintiff saw ARNP Pam Morgan for his varicose veins.  R.

417.  He reported living alone and having completed 12 years of education.  R. 416.

His chief complaint was right leg swelling and pain.  R. 417.  Plaintiff informed her he

was a chef and "works on his feet an average of 14 hours a day when working and he

works full time." *Id.* He was happy with his job even though he was working a lot.

Although he had a history of varicose veins, he had not seen a physician about the

problem previously because they were never as bad as they had become. Plaintiff

reported the vein on the inside right leg felt swollen and warm, and hurt more when he

was lying down. Although he could feel the veins on the left leg, they did not hurt like

the veins in the right leg. He reported trying a pair of compression stockings, but took

them off after an hour due to increased pain. R. 417. ARNP Morgan noted (in general

and bilaterally) localized swelling of the leg and tenderness on ambulation of the leg.

R. 418. Regarding the right leg, she noticed swelling of the medial aspect in the middle;

warmth of the medial knee area, underlying a large varicose vein that was firm and

tender to touch. She examined his left leg and found large varicose veins that were non

tender, soft, without redness or swelling or warmth. *Id.* His psychiatric exam was

normal and Plaintiff was calm and appropriate to the effect. *Id.* Her assessment was

varicose veins with inflammation, swelling, pain, varicose veins of the right leg, and

thrombophlebitis of superficial vessels of the lower extremity. *Id.* Plaintiff was

instructed to "rest with leg elevation being a MUST" and "to get a pair of TED hose." *Id.*

Plaintiff's goal was to maintain a regular exercise walking regimen of 45 minutes a day.

*Id.* Weight loss was discussed and Plaintiff was told not to stand in one place for more

than 15 minutes. R. 419. Plaintiff would discuss with his boss about adding more

padding to the mats. *Id.*

During a follow-up examination on June 8, 2009, ARNP Morgan noted that

Plaintiff was feeling better after being off work for two days "so he has been able to

elevate as discussed." R. 412. ARNP Morgan noted "localized swelling of the leg

which is resolving"; swelling of the medial aspect in the middle of the right leg which is resolving--no warmth or redness; varicose vein still prevalent but not engorged, soft; leg exhibited no warmth of the medial knee area; and the underlying large varicose vein was firm and tender to touch.  R. 413.  The left leg was soft and non-tender; varicose veins were visible, but not engorged or tender and there was no swelling or edema of the left leg.  *Id.*  ARNP Morgan's assessment included varicose veins with inflammation and pain, and muscle spasm of the right lateral thoracic spine.  *Id.*  She noted discussion of "the appropriate home management, including [over-the-counter] meds, rest with leg elevation being a MUST."  *Id.*  Plaintiff intended to exercise by walking 45 minutes daily.  *Id.*  Plaintiff was instructed "not to stand in one place for more than 15 minutes."  APNP Morgan added: "He is to be moving – Reports he has mats to stand on but will talk with restaurant owner about adding more padding."  Plaintiff was to get good support shoes as the ones he had were wearing, old, and in need of replacing.  R. 413-14.

On June 23, 2009, Plaintiff reported to ARNP Morgan that his knee had "more burning pain."  He is still working 14 hours a day; reports "wearing out" quicker than he had in the past; not exercising after work; and only taking Ibuprofen daily.  His right knee had point tenderness with "medial aspect joint space."  He was prescribed Flexeril orally three times a day for 30 days.  R. 415.  ARNP Morgan's assessment included varicose veins with pain, varicose veins of the right leg, obesity, and fatigue.  R. 416. On June 24, 2009, Plaintiff was seen by ARNP Morgan for problems related to obesity, muscle spasm, and fatigue.  R. 415.  On June 30, 2009, Plaintiff saw ARNP Morgan for

leg cellulitis.  The assessment included varicose veins with pain; varicose veins of the right leg; obesity; hyperglycemia; and fatigue.  R. 414.

On July 23, 2010, Plaintiff was evaluated by licensed psychologist Ronal E. Smith, Ph.D., at the request of the Rehabilitation Services Division of the Georgia Department of Labor.  R. 342-48 (Exhibit 3F), R. 432-38 (Exhibit 12F-same report); *see* R. 27-29, 31-32, 35.  Plaintiff reported that he was a recovering crack cocaine addict, had used drugs off and on for 20 years, and attended a residential treatment program for 110 days in 2007.  R. 343.  At the time of the interview, Plaintiff reported that he had not used substances in four months.  He was not attending any group counseling sessions.  *Id.*  Dr. Smith noted that Plaintiff was alert throughout the assessment; cooperative and pleasant and oriented to time, place, person, and situation; his attention span was mildly impaired; and Plaintiff had abnormally loud and fast speech, although his psychomotor activity was normal within the session.  Plaintiff's verbal comprehension was unimpaired.  R. 344.

His immediate memory was intact, although his delayed memory was below average.  No hallucinatory phenomena were present and his affect was appropriate to the content of his speech and demonstrated a normal range of expression.  He had no suicidal ideation or thoughts of harming others.  Practical judgment was intact and abstract reasoning was unimpaired.  R. 345.

The Reynolds Intellectual Assessment Scales were administered and Plaintiff was found to have IQ scores ranging from 71 to 92, resulting in a Composite Index of 80, "which is equivalent to a percentile rank of 9 and places his overall intellectual ability in the **Below Average** or **Borderline** range.  The chances are 90 out of 100 that

[Plaintiff's] true Composite Index score falls between 76 and 86." R. 345. Dr. Smith

noted: "[Plaintiff's] fluid intelligence is much better developed than his crystalized ability

and he will handle tasks that are not heavily dependent upon language-based reasoning

more easily than those that are more language dependent. Practical hands-on tasks

will be his strong suit." R. 346. Plaintiff's math and reading skills were at the third and

fourth grade level. Plaintiff reported "significant problems communicating through

writing." R. 346. Plaintiff "reported that he prefers to learn new skills through

demonstration followed by opportunities for independent practice." *Id.* Plaintiff

"reported no restriction in any activities of daily living." *Id.*

Dr. Smith diagnosed Attention Deficit/Hyperactivity Disorder, Predominantly

Hyperactive Type; Adjustment Disorder with Depressed Mood; Cocaine Dependence,

Early Partial Remission; and Borderline Intellectual Functioning. R. 27, 346-47.

Dr. Smith assigned Plaintiff a Global Assessment of Functioning (GAF) score of "60-

current."[13] Dr. Smith opined that Plaintiff "is experiencing a significant degree of

---

[13] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV-TR 34. A GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships. *Id.* A GAF score of 71 to 80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors; no more than slight impairment in social, occupational, or school functioning. *Id.* The "Commissioner has declined to

emotional distress primarily characterized by depressive symptoms … is attempting to deal with his drug dependence on his own" and successful treatment of Plaintiff's substance abuse, mood disorders and ADHD "is necessary if he is to achieve his full potential in the work place." Dr. Smith recommended Plaintiff "should be referred to a mental health clinician experience in treating patients with a combination of substance abuse, mood disorders and ADHD." R. 347-48. The ALJ considered Dr. Smith's opinions, R. 27-29, 31-32, and found his "findings are generally consistent with the record and support a finding of "not disabled." The ALJ considered Dr. Smith's credentials and afforded "some weight" to his assessment. R.32.[14]

---

endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

[14] On September 19, 2011, Dr. Smith completed several *check-mar*k questionnaires, without an additional examination. R. 336-40 (Exhibit 3F). First, Dr. Smith opined that Plaintiff's pain due to arthritis produced distracting pain, even if working in a sedentary position, and that the "severe" mental effects of pain precluded the attention and concentration required of even simple, unskilled work tasks. R. 336-37. Second, in a Mental Residual Functional Capacity Assessment, Dr. Smith opined that Plaintiff was "markedly limited," defined as "[t]he patient's restriction in this area would be sufficient to preclude performance," R. 338, in all three areas of understanding and memory, six out of eight areas of sustained concentration and persistence, two out of five areas of social interaction, and in two out of four areas of adaptation. He found Plaintiff to be "moderately limited" or "significantly compromise but not totally preclude performance" in all other areas of work-related abilities. R. 338-40. The ALJ referred to these questionnaires as a medical source statement and gave them "little weight because of the assessment's inconsistency with the overall evidence of record received at the hearing level and the remoteness of the assessment (Exhibit 3F)." R. 35. (Dr. Smith's only evaluation was on July 23, 2010. R. 342-48.) The ALJ considered

On August 18, 2010, the Rehabilitation Services Division of the Georgia Department of Labor sent Plaintiff for an evaluation with Christopher W. Ratchford, M.D. R. 441-42 (Exhibit 13F). Although the evaluation notes from the visit are not in the record, Dr. Ratchford completed a Physical Capacities Evaluation. *Id.* Dr. Ratchford found that Plaintiff had a probable medial meniscal tear with tricompartmental arthritis of the right knee, severe varicose veins of the right lower extremity with associated pain, worse with prolonged standing. R. 441. He recommended a surgical evaluation for vein stripping. Dr. Ratchford opined, however, that Plaintiff would be capable of sitting eight hours, standing two hours, and walking two hours in an eight-hour workday, and could frequently lift and carry up to 20 pounds. Plaintiff could also bend occasionally and frequently reach above shoulder level and within normal range of arm/shoulder range of motion. He could use his feet for repetitive movements as in operating foot controls and no aids were recommended. He could not squat, crawl, or climb. R. 441. Without mentioning his report by name, the ALJ, referring to Exhibit 13F, gave Dr. Ratchford's opinion "little weight," referring to it as a medical source statement of a licensed physician. R. 36.

On October 18, 2010, Hector Aviles, M.D., a psychiatrist, performed an initial psychiatric evaluation/examination. R. 445 (Exhibit 14F); *see* R. 487-91 (Exhibit 20F-same records); *see also* R.32. Plaintiff's goal was to be able to work through his feeling and emotions and gain healthy, positive ways of coping with depressive symptoms and to able to stay clean and sober of all drugs and alcohol. *Id.* Plaintiff's chief complaints were depression and unemployment since April 2010. *Id.* Plaintiff was alert, but frail.

---

Dr. Smith's credentials. *Id.* ("Child, Adolescent, & Family Psychology" is stated to the right of Dr. Smith's name and degree. *See, e.g.,* R. 342, 432.)

R. 445.  His actions were cooperative, yet bizarre and dramatic.  Plaintiff was also restless, with disorganized speech.  His estimated intellectual activity was average. R. 446.  His memory was grossly intact, mood dysphoric and depressed, and affect was mood congruent, and circumlocultous thought process.  R. 446-47.  His vision was impaired.  There was no evidence of suicidality.  R. 447.  He was oriented times 4; cooperative; his memory, calculation, and insight were fair and impulse control and judgment was good.  He had not used substances in the past month.  R. 446.  The clinical diagnoses included major depressive disorder, recurrent, severe without psychotic features; cocaine dependence; post-traumatic stress disorder (PTSD), and mild mental retardation.  R. 447.  No psychosocial or environmental problems were noted, although Plaintiff had problems with his primary support group, noted as severe. His GAF score was 55.  *Id.*  Aside from some problems noted regarding Plaintiff's teeth and partial rating for cooperation, no physical or other mental issues are noted.  R. 448-49.

On November 3, 2010, Dr. Aviles noted that Plaintiff was still depressed and Vistaril caused the side-effect of drowsiness.  R. 492.  Dr. Aviles noted that, in addition to being drowsy, Plaintiff was cooperative yet bizarre and dramatic, restless, anxious, dysphoric, and depressed.  R. 493.  Vistaril was discontinued and Remeron and Buspar were adjusted for anxiety.  R. 494.  Similar diagnoses are noted as stated above. R. 494-95.

On November 16, 2010, Plaintiff was examined by James Franklin, M.D., at the Commissioner's request for use in making a determination of disability and for no other purpose.  R. 450-58 (Exhibit 15F).  Plaintiff reported severe varicose veins with daily

lower extremity edema, becoming problematic in the past seven months. Plaintiff noted, however, he had been using a cane to ambulate for the past year. R. 452. Plaintiff could dress and feed himself. His right leg and foot were more painful than the left. Plaintiff reported being able to stand no longer than five minutes at one time, sit no more than 20 minutes, walk on level ground for 60 feet, and lift no more than five pounds. He drove a car. Plaintiff reported his only household chore was vacuuming. His medications were Mobic, Buspar, Atarax, Zoloft, and Remeron. He did not wear glasses and no hearing loss was noted, and no unusual disturbances were noted. R. 452. Plaintiff was noted to be 5' 8" and 271 pounds. Dr. Franklin observed that Plaintiff had "moderate difficulty getting to the examination room … moderate difficulty getting on and off the examination table, up and out of a chair, and dressing and undressing himself." R. 453.

Upon examination, Dr. Franklin noted only trace pulses in the feet, with 1+ pedal edema bilaterally with "significant lower extremity varicosities, especially of the right lower extremity." He was noted to have "a severe right limp and was utilizing a right cane." R. 453, 457. "Hearing was entirely normal. Speech was 100% understandable." R. 453. Plaintiff was unable to perform hip range of motion testing due to severe pain, could not walk on his heels or toes, and could not perform a squat even though he was "very cooperative" and "made and excellent effort." He was normal heal-to-toe. R. 453-54. Spinal range of motion was significantly limited, and Plaintiff had moderate weakness of the right lower extremity and mild weakness of the left lower extremity. R. 455-57. A right knee x-ray revealed slightly decreased joint space, especially of the medial compartment. R. 454. The neurologic examination indicated Plaintiff was alert

and oriented times 4 and responded very well to the examiner.  *Id.*  His motor strength was 5/5 throughout with the exception of his right lower extremity proximal and distal muscle groups 3+/5 and left lower extremity proximal and distal muscle groups 4/5.  No muscle atrophy was noted.  Sensation was entirely intact throughout.  Dr. Franklin recorded a negative Romberg; no nystagmus; normal finger-to-nose and heel-to-shin; intact cranial nerves II through XII; deep tendon reflexes were 1+ bilaterally and symmetric.  *Id.*  An x-ray of Plaintiff's right knee showed slightly decreased joint space.  Dr. Franklin diagnosed a history of bilateral lower extremity varicosities, attention deficit disorder, illicit drug abuse, history of decreased bilateral hearing, *see supra* at 16-17, and a history of bilateral foot osteoarthritis.  Dr. Franklin opined that Plaintiff's "multiple medical problems do support a moderate limitation at this time."  R. 454, 458.  Plaintiff was cooperative and made an excellent effort.  Dr. Franklin provided an "important note," to wit, "did have a normal ability to hear and understand conversational speech."  R. 454.  The ALJ determined that "Dr. Franklin's findings are generally consistent with the record and support a finding of 'not disabled'" and afforded "his assessment some weight."  R. 33.

On November 22, 2010, a non-examining State agency psychologist, Patricia Alexander, Ph.D., completed a Psychiatric Review Technique (PRT) and opined that Plaintiff's mental impairment was not severe.  R. 459 (Exhibit 16F); *see* R. 471 (consultant's notes) (Plaintiff appears able to understand and follow simple instructions with adequate concentration and attention; has some problems in social interaction because of depression, anxiety, continuing SA as well as psychosocial stressors; overall appears to be able to interact appropriately with supervisors and co-workers and

adapt to work setting with non-severe impairment when clean and sober).  *Compare with* R. 530 (Dr. Silver's consultant's notes); R. 28-29, 34.  The ALJ afforded Dr. Alexander's opinions "significant weight."  The ALJ also stated he fully accounted for her suggested limitations that are supported by the record in forming Plaintiff's RFC. R. 34.

On January 20, 2011, non-examining State agency physician, Thomas Jeffcoat, M.D., opined that Plaintiff could perform light exertional activity.  R. 477-84 (Exhibit 19F).  The ALJ found Plaintiff "somewhat more limited based on the overall evidence received at the hearing level" and afforded "some weight" to his opinions.  The ALJ stated that he accounted for Dr. Jeffcoat's suggested limitations that were supported by the records in formulating Plaintiff's RFC.  R. 35.  (On December 9, 2010, Dr. Jeffcoat performed a medical consultant review affording a brief explanation.  R. 473 (Exhibit 17F).)

On May 16, 2011, Plaintiff sought emergency care at the Habersham County Medical Center Emergency Department for right leg pain with chest pain.  R. 305 (Exhibit 1F); *see* R. 499-517 (Exhibit 21F-similar records); *see also* R. 32-33.  Plaintiff reported having bilateral leg pain for the past two years, but noted it had worsened in the past six months with an increase in varicose veins.  R. 306, 308, 314.  Plaintiff was diagnosed with new onset diabetes mellitus, type 2, and high blood pressure. Secondary diagnosis was varicose veins with leg pain.  R. 307.  Plaintiff was prescribed medications for diabetes, blood pressure, and pain.  R. 305-09.  A bilateral Doppler ultrasound study of his lower extremities was negative and showed no evidence of deep vein thrombosis.  R. 306, 314, 516-17.

On May 18, 2011, Plaintiff was seen for an initial psychiatric examination with Alita Joglekar, M.D., at AVITA Community Partners (AVITA) due to symptoms of depression.  R. 325 (Exhibit 2F); *see* R. 23.  Dr. Joglekar noted that Plaintiff had been seen in the past, but was noncompliant, and was ultimately discharged because he was taking more Remeron than prescribed and did not "get along" with his assigned counselor and "missed meetings."  R. 326.  A "longstanding history" of noncompliance, antisocial personality traits, and depression were noted.  R. 327.  Plaintiff reported no substance use for the prior two weeks, and was prescribed Zoloft, Remeron, Vistaril, and Buspar and was "asked not to use his judgment and stick to strict medical directions."  R. 326.  The therapist noted that Plaintiff was alert, oriented, neatly groomed, cooperative, and calm; his speech was normal; had below average intelligence, but had intact memory and though processes; his mood was euthymic and affect normal; and he denied any suicidal or homicidal ideation.  R. 327.  Dr. Joglekar diagnosed Major Depressive Disorder, Recurrent, Severe without Psychotic Features; Generalized Anxiety Disorder; Cocaine Dependence; PTSD; Antisocial Personality Disorder; and Mild Mental Retardation.  His GAF score remained at 55.  R. 327-28.

In May 2011, Plaintiff presented to Caring Hands Health Clinic (CHHC) for diabetes and hypertension.  R. 350.  On June 7, 2011, Plaintiff was seen at CHHC for hypertension and diabetes.  He was noted to have 1+ varicose veins, right lower extremity greater than left, and was instructed to continue taking his medications.  No problems were reported other than as noted.  *Id.*

On July 11, 2011, Plaintiff returned to AVITA for counseling and met with Charlotte Ekard.  R. 331, 557.  He was alert, oriented, cooperative, and spoke

articulately.  Plaintiff was of average intelligence.  His mood was depressed and affect

blunted, but he denied any suicidal or homicidal ideation and was a danger to others.

R. 332.  He had restarted medications the prior week, was found to be depressed, and

expressed interest in residential treatment for his history of drug use.  R. 331-34.

On July 12, 2011, a second non-examining State agency psychologist, Wendy

Silver, Psy.D., completed a PRT and opined that Plaintiff's mental impairments were not

severe.  R. 518 (Exhibit 22F); *see* R. 530 (consultant's notes); *compare with* R. 471; *see*

R. 28, 34-35.  Dr. Silver found that Plaintiff's mental impairments resulted in mild

restrictions in Plaintiff's daily activities, mild difficulties in social functioning, and mild

difficulties in his ability to maintain concentration, persistence, and pace.  R. 528.  The

ALJ afforded her opinions "significant weight" and "fully accounted for [her] suggested

limitations that are supported by the record in forming [Plaintiff's RFC]."  R. 35.

On August 1, 2011, non-examining State agency physician Louise Tashjian,

M.D., reviewed updated information and opined that Plaintiff could perform light

exertional activity.  R. 532-39 (Exhibit 23F); *see* R. 533-34 (explanation).  The ALJ

afforded his opinions "some weight" and found Plaintiff "somewhat less limited."  R. 35.

On October 24, 2011, Plaintiff returned to AVITA for medication management.

R. 561.  Ms. Ekard noted Plaintiff ran out of his medications recently because he could

not pay for them.  R. 562.  He participated, however, in "group and is enjoying it" and

was involved with vocational rehabilitation in addition to being "actively involved" in

treatment through AVITA.  R. 562-63.  He also requested assistance in finding a new

place to live "in order to stay away from people who are using", and was trying to move

into a boarding house because his roommate was an alcoholic.  R. 561-62.  Plaintiff's

mental status notes indicate he was alert, oriented, neat, cooperative, normal speech, average intelligence, coherent though process, normal thought content, denied hallucinations and suicidality, normal affect yet restless, and he had a dysphoric mood with impaired short-term memory. R. 561-62. On October 25, 2011, Plaintiff sought treatment at CHHC due to lower extremity numbness and tingling. R. 578.

On December 12, 2011, Stephen J. Suss, M.D., completed a "physical capacity evaluation" of Plaintiff. R. 358-60 (Exhibit 5F); R. 594-96 (Exhibit 26F-same); *see* R. 33, 36. Dr. Suss referred to "additional information" and noted that Plaintiff was limited by "severe DJD [degenerative joint disease] of knees and feet. Extensive varicosities of the lower extremities which cause pain and limit ability to walk and sit. Chronic anxiety and depression. IQ measured at about 80." He referred to Plaintiff's "past medical history" and "family history." R. 358. Plaintiff complained of, in part, fatigue, blurred vision and focal weakness (corrective lenses), chronic weakness, and headache. He denied ear pain and hearing loss. He denied back and joint pain, joint swelling, limited range of motion, muscle aches and weakness and stiffness. He denied abnormal gait, incoordination, memory problems, numbness, seizures, slurred speech, and tremor. R. 359. Dr. Suss noted Plaintiff's general appearance was "chronically ill," but he was alert and oriented times three and his nutritional status was normal. *Id.*

Upon examination, Dr. Suss noted regarding his extremities, "[d]iffuse extensive v[a]ricose veins with thrombosis", but negative for clubbing, cyanosis, edema, and other. R, 360. Regarding his musculoskeletal system, Dr. Suss noted crepitus, osteoarthritic changes, and muscle atrophy of both lower extremities. *Id.* His mental status was "[g]rossly normal" and affect and judgment were normal. Dr. Suss did not

recommended any treatment plan or a need for follow-up.  R. 360.  The ALJ considered Dr. Suss's evaluation.  R. 33.

Dr. Suss completed several *check-mark* questionnaires on the same day after performing the limited examination referred to above, R. 358-60 (Exhibit 5F).  R. 354-357 Exhibit 5F).  Dr. Suss opined that Plaintiff's pain had a reasonable medical basis for Plaintiff's pain, specifically, "extensive DJD [degenerative joint disease] [of the] low back, knees and feet" with "[s]evere pain due to extensive large varicose veins in both legs" such that he was unable to work full time at a sedentary job.  R. 356.  On the "mental effects of Pain" form, he marked the "moderate" category, which classified Plaintiff's pain as "a significant handicap with sustained attention and concentration [that] would eliminate skilled work tasks."  R. 357.  Dr. Suss also completed a Physical Capacities Evaluation, opining by checking-off or circling items, that Plaintiff was limited to sitting for one hour and standing/walking two hours total in an eight hour day.  He would also need to alternate sitting and standing "at will" throughout the day.  Although he could use his hands for simple grasping, he would be unable to perform pushing/pulling and fine manipulation or repetitive tasks.  He would also be unable to perform repetitive movements with his feet.  R. 355.  Dr. Suss opined that Plaintiff could occasionally carry up to ten pounds, and his fatigue had a reasonable medical basis. Dr. Suss explained that Plaintiff had "poor mobility and loss of conditioning due to severe DJD [degenerative joint disease]."  As a result, Dr. Suss opined that Plaintiff would be unable to perform even sedentary work activity.  (He could never lift more than 10 pounds and occasionally lift zero to ten pounds.)  *Id.*

On April 17 and 23, 2012, Dr. Suss completed a second set of *check-mark* forms, without a contemporaneous physical examination. R. 361-67 (Exhibit 6F); R. 36. On the Physical Capacities Evaluation, Dr. Suss included the same limitations as in the December 2011 Physical Capacities Evaluation, again noting Plaintiff's "poor mobility and loss of conditioning due to severe [degenerative joint disease]." R. 361-62. Dr. Suss again opined that Plaintiff's pain had a reasonable medical basis, being "extreme [degenerative joint disease] of the spine, knees, and feet [in addition to] extensive varicose veins and pain to lower extremities." R. 363. He again opined that the mental effects of pain would preclude the performance of skilled work tasks. R. 364. Dr. Suss also completed a Mental Residual Functional Capacity Assessment, indicating moderate limitation or "significant compromise" in 17 out of 20 areas of work-related functioning. R. 365-67.

On June 8, 2012, Dr. Suss completed a third set of *check-mark* forms, without a contemporaneous physical examination. R. 587-93 (Exhibit 26F); *see* R. 36. Dr. Suss's conclusions were similar to those he reached in December 2011, R. 354-60, and in April 2012, R.361-67. On the Physical Capacities Evaluation, Dr. Suss opined that Plaintiff could sit three hours (one hour on prior forms) and stand/walk less than one hour total in an eight-hour day. He could not perform pushing and pulling or simple grasping with his hands, but could perform fine manipulation with both hands. R. 587-88. Dr. Suss again noted that Plaintiff had a reasonable medical basis for his pain, with severe degenerative joint disease of the knees and feet, and marked varicosities of the lower extremity causing the chronic pain. He opined that this pain would prevent the performance of even sedentary work, and would interfere with the attention required for

skilled work tasks.  R. 589-90.  He also opined that Plaintiff exhibited a moderate limitation, or significant compromise, in all areas of work-related function.  R. 591-93.

Although the ALJ considered Dr. Suss's December 2011 evaluation, R. 33, the ALJ gave his "Medical Source Statements" "little weight because of the assessments' inconsistency with the overall evidence of record received at the hearing level and the remoteness of the assessments (Exhibits 5F [R. 354-60]; 6F [R. 361-67]; 26F [R. 586-96])."  R. 36.  The ALJ considered Dr. Suss's credentials.  *Id.*

On January 24, 2012, CHHC noted that Plaintiff was out of his medications for about six weeks, and continued to have varicose veins of the lower extremities.  R. 577.

On February 24, 2012, Plaintiff returned to AVITA for medication management with an APRN Linda Woughter.  He reported last using cocaine two weeks prior, and only taking psychiatric medications "every now and then."  He was prescribed Zoloft, Remeron, and Buspar, and instructed that the medications would not help his depression if not taken regularly.  R. 566.  Plaintiff also discussed obtaining treatment through Narcotics Anonymous.  R. 567.  He was alert and oriented; he appeared neatly groomed and was calm, cooperative, and spoke normally; he was of average intelligence and had grossly intact memory; his mood was euthymic and affect normal; and his thought processes and content were intact.  R. 566.

On May 3, 2012, the CHHC noted that the church was going to assist Plaintiff in obtaining his diabetes and blood pressure medications.  R. 575.  On May 4, 2012, Plaintiff returned to AVITA and ARNP Woughter.  Plaintiff reported his last drug use was March 18, 2012, and reported that his roommate had finally stopped drinking.  He ran out of his psychiatric medications a week prior.  R. 570.  Counseling and medication

refills were provided.  R. 571.  The mental status examination results were similar to prior results.  *Compare* R. 566-67 *with* R. 570-571.

### D.  Evidence Submitted to the Court

On August 29, 2013, Plaintiff filed his memorandum with the Court.  Doc. 15. Plaintiff also filed what purports to be new evidence consisting of 19 pages.  Doc. 15-1. This new evidence is from the Florida Department of Education, Division of Vocational Rehabilitation.  *Id.*  It appears that on February 19, 2013, Plaintiff had an initial consultation with A. M. Carr, M.D., of Capital Neurosurgery, in Tallahassee, Florida, upon referral from the vocational rehabilitation state agency.  *Id.* at 5-7.  Plaintiff's chief complaint was right and left upper and lower extremity pain.  *Id.* at 5.  He reported the extent of his pain regarding his cervical spine.  He did not complain of neck pain.  *Id.* Plaintiff reported his pain regarding his lumbar spine.  *Id.*  It was noted that Plaintiff has never had physical therapy and has not been to pain management.  *Id.*  A review of systems did not reveal any complaints, although high blood pressure, diabetes, and positive findings regarding left and right arm and leg pain are stated as well as neurological numbness, tingling, and weakness.  Plaintiff was in no acute distress, pleasant and cooperative, and appeared generally healthy and obese.  *Id.* at 6.

The musculoskeletal examination revealed the following:

> Muscle strength is 5/5 in upper and lower extremities.  Muscle strength is decreased: Bilateral feet are tender to touch, so strength exam is difficult.  He appears at least 4/5 in dorsiflexion and plantarflexion.  Muscle tone is normal in upper and lower extremities.  Sensation is normal: hypesthetic bilateral feet to mid shin, right worse than left.  Deep tendon reflexes in lower extremities are symmetric at ¼ in patellar and achilles bilaterally.  Toes are down going and there is no clonus.  Coordination is intact finger to nose.  Gait: limping.

Doc. 15-1 at 6.  The neurological examination revealed the following:

> Orientation is full. Attention span and concentration is normal. Recent and remote memory is grossly intact. Language shows no aphasias. Fund of knowledge is appropriate for age and educational background.

*Id.* A review of Plaintiff's cranial nerves appeared normal. *Id.* at 7. Dr. Carr's diagnoses were: cardiac hypertension; non-insulin dependent diabetes mellitus; peripheral neuropathy; depression; and arthritis. *Id.* A follow-up appointment would be scheduled after various tests were performed, including spine and cervical MRI's. *Id.*

On March 12, 2013, Plaintiff met with Dr. Carr, doc. 15-1 at 8-10, after the results of the MRI's were provided, *id.* at 18-19. Plaintiff's main complaint was still "bilateral foot burning and pain." *Id.* at 8. As before, most tests appeared normal, except for the musculoskeletal and neurological examinations where positive left and right arm and leg pain were positive. *Id.* at 9. The musculoskeletal examination results were as follows:

> Muscle strength is 5/5 in upper and lower extremities. Muscle tone is normal in upper and lower extremities. Sensation is abnormal: Hypesthetic bilateral feet. Hoffman's is absent bilaterally. Deep tendon reflexes in lower extremities are symmetric at ¼ in patellar and achilles bilaterally. Toes are down going and there is no clonus. Pt needs to be distracted and the muscle arcs loaded to obtain reflexes. Clonus is [p]resent on the left at 1-2 beats consistently. Coordination is intact finger to nose. Difficult to get pt to relax enough to get reflexes. He does have diabetes, so his peripheral neuropathy can mask early myelopathy. He does have clonus in the left foot, and an intermittent Hoffman's on the left. Difficult to get consistency as pt tries to help.

*Id.* Diagnoses were similar, although mild degenerative disc disease of the lumbar spine is noted with no nerve root compression. Degenerative disc disease of the cervical spine was noted at C3-4, C4-5, C5-6, and C6-7. Spinal stenosis was noted at C3-4, C4-5, and C5-6, with spinal cord compression and worst level is C5/6. *Id.* Dr. Carr noted that "[s]ome of his leg issues may be coming from his cervical spine, but more likely his diabetes. Patient is a surgical candidate for Anterior Cervical

Decompression and Fusion at C3-4." Doc. 15-1 at 9-10. Plaintiff was warned of the risks. *Id*. at 10. Dr. Carr did not provide an opinion of Plaintiff's ability to work.

Jennifer Stovall, M.S., CRC, a senior vocational rehabilitation counselor, wrote a letter to the Social Security Administration briefly outlining the preceding discussion. She requested that Plaintiff be considered for benefits. Doc. 15-1 at 1. The documents also include a May 14, 2013, note from Ms. Stovall that appears to have been e-mailed to Dr. Hollifield, apparently requesting his "assistance in determining the best options and plan for" Plaintiff. *Id*. at 2. There is also a response from the consultant stating that sending Plaintiff to surgery "might create more problems than are solved." *Id*. The consultant referred to "underlying diabetes" and a "clear reference to 'cord compression' and MRI." *Id*. at 2-3. It was also noted that Plaintiff had not worked "for several years" and there was "no apparent role for further VR intervention." *Id*. at 3.

## V. Legal Analysis

### A. Substantial Evidence Supports the ALJ's Step Two Determination

Plaintiff argues that the ALJ erred when, at step two, he did not find that Plaintiff's mental impairments were severe. Doc. 15 at 13-16. At step two, it is Plaintiff's burden to produce evidence of and prove that he has severe mental impairments that significantly limit his ability to perform basic mental work-related activities. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). The issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). To be considered "severe," a medical condition must constitute more than a "deviation from purely

medical standards of bodily perfection or normality." <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986). Further, a diagnosis alone is not a sufficient basis for a finding that an impairment is severe because "the 'severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *Id.* at 1547. "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" <u>Parker v. Bowen</u>, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* <u>Brady v. Heckler</u>, 724 F.2d 914, 920 (11th Cir. 1984), <u>Edwards v. Heckler</u>, 736 F.2d 625, 630 (11th Cir. 1984), and <u>Flynn</u>, 768 F.2d at 1274.

On the other hand, "[s]tep two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. . . .Claimant need show only that her impairment is not so slight and its effect is not so minimal." <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying <u>Brady</u>). It was been said that step two of the sequential analysis may do no more than screen out de minimus claims. <u>Stratton v. Bowen</u>, 827 F.2d 1447, 1453 (11th Cir. 1987). Nevertheless, an impairment is not severe if it does not significantly limit a claimant's mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). If a claimant has none or mild limitations in activities of daily living, social functioning, and concentration, persistence or pace, and none in the area of episodes of decompensation, the claimant is generally considered to have no severe mental

impairment unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work. 20 C.F.R. § 404.1521a(d)(1).[15]

At step two, the ALJ determined that Plaintiff had several severe impairments: "degenerative joint disease of the right knee; history of bilateral lower extremity varicosities; bilateral foot osteoarthritis; diabetes mellitus; and obesity." R. 26.[16] The ALJ concluded "that this combination of impairments is severe in nature because the impairments cumulatively result in functional limitations or restrictions having more than a minimal effect on the claimant's ability to perform basic work activities." R. 27.

The ALJ also considered other medically determinable impairments, including Plaintiff's history of decreased hearing, attention-deficit hyperactivity disorder, hypertension, depression, anxiety, PTSD, anti-social disorder, marijuana and cocaine dependence, and borderline intellectual functioning and found these impairments to be non-severe because whether they are considered individually or in combination "they have had minimal (if any) limiting effects on the claimant's functioning." R. 27.

The ALJ referred to the evaluation performed by Dr. Smith, a consultative examiner, on July 23, 2010. R. 27; *see* R. 432-48 (Exhibit 12F), 342-48 (Exhibit 3F (same); *see also* R. 20-22. Specifically, at step three, the ALJ referred to Dr. Smith's July 23, 2010, evaluation and stated that

> Dr. Smith diagnosed the claimant with borderline intellectual functioning and indicated that the claimant's reading ability is mildly impaired and his mathematical ability is below average; however, he otherwise opined the claimant's fluid intelligence is much better than his crystallized ability and he is

---

[15] The ALJ is not required, however, to identify all of the impairments that should be considered severe. *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished).

nonetheless able to handle tasks that are not heavily dependent upon language-based reasoning.

R. 29.  As also noted by the ALJ,

> Dr. Smith's findings are ostensibly supported by the results of his mental status examination, wherein he noted that the claimant was alert throughout the examination, had good eye contact, was cooperative and pleasant, was oriented to person, place, time, and situation, his psychomotor rate was within normal limits, his verbal comprehension was unimpaired, his memory was intact, his thought process was logical and coherent, his affect was appropriate, his expression was within normal limits, his judgment was practical, his abstract reasoning was unimpaired, he endorsed no delusions, obsessions, compulsions, and/or phobias, and he did not endorse hallucinatory phenomena (Exhibit 12F).

*Id.*; *see* R. 344-45, 437-38.  The ALJ also referred to Dr. Smith's July 2010 report when considering Plaintiff's RFC and found his "*findings* are generally consistent with the record and support a findings of 'not disabled.'"  R. 32 (emphasis added).[17]  The ALJ assigned his assessment "some weight."  R. 32.

On September 19, 2011, without any evidence that he performed a second, in-person, examination of Plaintiff or that he reviewed any intervening medical records or had any further discussions with Plaintiff, Dr. Smith filled out several *check-mark* questionnaires that are favorable to Plaintiff, having found (by check-mark) Plaintiff markedly limited in many areas in the mental RFC assessment.  R. 338-40 (Exhibit 3F); *see supra* n. 14.  The ALJ afforded the latter assessment "little weight" because it was

---

[17]  Plaintiff refers to Dr. Smith's note in July 2010 that Plaintiff was experiencing a "significant degree of emotional distress primarily characterized by depressive symptoms."  Doc. 15 at 14; *see* R. 347.  Dr. Smith added to this statement that Plaintiff was "attempting to deal with his drug dependence on his own" and that successful treatment of Plaintiff's substance abuse, mood disorders and ADHD "is necessary if he is to achieve his full potential in the work place."  Dr. Smith recommended that Plaintiff be referred to a mental health clinician experienced in treating patients with a combination of substance abuse, mood disorders, and ADHD.  R. 347-48.

inconsistent "with the overall evidence of record received at the hearing level and" was remote from, at least, Dr. Smith's July 23, 2010, evaluation.[18]  R. 35.

Dr. Smith did not opine that Plaintiff was so restricted by his mental status that his functional abilities were so severely impaired that he was unable to perform light work.  Contrary to Plaintiff's position, substantial evidence supports the ALJ's conclusion that Dr. Smith's September 2011 assessment is remote and not consistent, for the most part, with his July 2010 evaluation.

Plaintiff also argues that Dr. Smith's September 2011 assessment is consistent with Dr. Suss' April 17, 2012, mental RFC assessment in which he, Dr. Suss, opined that Plaintiff was *moderately*, not markedly limited in all but three areas.  R. 365-67.  By June 8, 2012, Dr. Suss opined that Plaintiff was *moderately*, not markedly limited in all areas.  R. 591-93.  Dr. Suss completed a series of check-mark questionnaires beginning in December 2011,[19] contemporaneous with his December evaluation, and check-mark questionnaires in April and June 2012, characterized by the ALJ as medical

---

[18]  In their initial evaluations, Drs. Smith and Suss, although noting several diagnoses, did not opine that Plaintiff's impairments, including any mental or physical condition, were of such magnitude that Plaintiff would be unable to perform light work, including work as a short order cook.  Without support from the medical records, such forms are generally not entitled to significant weight.  *See* Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) ("Given that the 'check-off form' did not cite any clinical test results or findings and Dr. Lowder's previous treatment notes did not report any significant limitations due to back pain, the ALJ found that the MSS was entitled to 'little evidentiary weight.'"); Dixon v. Astrue, No. 5:09-cv-320-RS-EMT, 2010 U.S. Dist. LEXIS 125831, 2010 WL 4942141, at *14-15 (N.D. Fla. Oct. 26, 2010) (ALJ properly rejected opinions expressed by treating physician on "check-off" type forms where treating physician's own treatment notes did not support opinions expressed on those forms).

[19]  The December questionnaires did not include a mental RFC assessment. R. 354-57.

source statements. The April and June statements were provided without the benefit of another physical examination of Plaintiff. R. 354-57, 361-67, 587-93.

The ALJ considered Dr. Suss's December 2011 evaluation. R. 33, 358-60 (Exhibit 5F). He also considered Dr. Suss's check-mark questionnaire/statements. R. 354-57 (Exhibit 5F), 361-67 (Exhibit 6F), 587-93 (Exhibit 26F). The ALJ determined that these assessments were inconsistent with the overall evidence of record received at the hearing level and remote and ultimately gave Dr. Suss' assessments "little weight." R. 36.

The ALJ made the foregoing determinations regarding Dr. Smith's and Dr. Suss's assessments made in the questionnaires based on a review of the record evidence, including the pre-hearing function reports and hearing testimony provided by Plaintiff and Mr. Cable. R. 27-36.

Notwithstanding, other physician and non-physician evaluation and treatment notes for Plaintiff's mental impairment do not support Plaintiff's argument. For example, in October 2010, Dr. Aviles performed an initial psychiatric evaluation/examination. R. 445. Plaintiff's goal was to be able to work through his feeling and emotions and gain healthy, positive ways of coping with depressive symptoms and to able to stay clean and sober of all drugs and alcohol. *Id.* Plaintiff's chief complaints were depression and unemployment since April 2010. *Id.* Plaintiff was alert, but frail. R. 445. His actions were cooperative, yet bizarre and dramatic. Plaintiff was also restless, with disorganized speech. His estimated intellectual activity was average. R. 446. His memory was grossly intact, mood dysphoric and depressed, and affect was mood congruent, and circumlocultous thought process. R. 446-47. His vision was

impaired.  There was no evidence of suicidality.  R. 447.  He was oriented times 4;
cooperative; his memory, calculation, and insight were fair and impulse control and
judgment was good.  He had not used substances in the past month.  R. 446.  The
clinical diagnoses included major depressive disorder, recurrent, severe without
psychotic features; cocaine dependence; post-traumatic stress disorder (PTSD), and
mild mental retardation.  R. 447.  No psychosocial or environmental problems were
noted, although Plaintiff had problems with his primary support group, noted as severe.
His GAF score was 55.  *Id.*  Aside from some problems noted regarding Plaintiff's teeth
and partial rating for cooperation, no physical or other mental issues are noted.  R. 448-
49.

On November 3, 2010, Dr. Aviles noted that Plaintiff was still depressed and
Vistaril caused the side-effect of drowsiness.  R. 492.  Dr. Aviles noted that, in addition
to being drowsy, Plaintiff was cooperative yet bizarre and dramatic, restless, anxious,
dysphoric, and depressed.  R. 493.  Vistaril was discontinued and Remeron and Buspar
were adjusted for anxiety.  R. 494.  Similar diagnoses are noted as stated above.
R. 494-95.

On May 18, 2011, Plaintiff was seen for an initial psychiatric examination with
Alita Joglekar, M.D., at AVITA Community Partners (AVITA) due to symptoms of
depression.  R. 325 (Exhibit 2F); *see* R. 23.  Dr. Joglekar noted that Plaintiff had been
seen in the past, but was noncompliant, and was ultimately discharged because he was
taking more Remeron than prescribed and did not "get along" with his assigned
counselor and "missed meetings."  R. 326.  A "longstanding history" of noncompliance,
antisocial personality traits, and depression were noted.  R. 327.  Plaintiff reported no

substance use for the prior two weeks, and was prescribed Zoloft, Remeron, Vistaril, and Buspar and was "asked not to use his judgment and stick to strict medical directions." R. 326. The therapist noted that Plaintiff was alert, oriented, neatly groomed, cooperative, and calm; his speech was normal; had below average intelligence, but had intact memory and though processes; his mood was euthymic and affect normal; and he denied any suicidal or homicidal ideation. R. 327. Dr. Joglekar diagnosed Major Depressive Disorder, Recurrent, Severe without Psychotic Features; Generalized Anxiety Disorder; Cocaine Dependence; PTSD; Antisocial Personality Disorder; and Mild Mental Retardation. His GAF score remained at 55. R. 327-28.

On July 11, 2011, Plaintiff returned to AVITA for counseling and met with Charlotte Ekard. R. 331, 557. He was alert, oriented, cooperative, and spoke articulately. Plaintiff was of average intelligence. His mood was depressed and affect blunted, but he denied any suicidal or homicidal ideation and was a danger to others. R. 332. He had restarted medications the prior week, was found to be depressed, and expressed interest in residential treatment for his history of drug use. R. 331-34.

On October 24, 2011, Plaintiff returned to AVITA for medication management. R. 561. Ms. Ekard noted Plaintiff ran out of his medications recently because he could not pay for them. R. 562. He participated, however, in "group and is enjoying it" and was involved with vocational rehabilitation in addition to being "actively involved" in treatment through AVITA. R. 562-63. He also requested assistance in finding a new place to live "in order to stay away from people who are using", and was trying to move into a boarding house because his roommate was an alcoholic. R. 561-62. Plaintiff's mental status notes indicate he was alert, oriented, neat, cooperative, normal speech,

average intelligence, coherent though process, normal thought content, denied hallucinations and suicidality, normal affect yet restless, and he had a dysphoric mood with impaired short-term memory.  R. 561-62.

On February 24, 2012, Plaintiff returned to AVITA for medication management with an APRN Linda Woughter.  He reported last using cocaine two weeks prior, and only taking psychiatric medications "every now and then."  He was prescribed Zoloft, Remeron, and Buspar, and instructed that the medications would not help his depression if not taken regularly.  R. 566.  Plaintiff also discussed obtaining treatment through Narcotics Anonymous.  R. 567.  He was alert and oriented; he appeared neatly groomed and was calm, cooperative, and spoke normally; he was of average intelligence and had grossly intact memory; his mood was euthymic and affect normal; and his thought processes and content were intact.  R. 566.

Relevant here, and when considering Plaintiff's RFC, the ALJ noted that licensed physicians diagnosed Plaintiff with depression and PTSD among other diagnoses, but further noted "they indicated [Plaintiff] was alert and oriented to person's and place, his memory was grossly intact, and he did not endorse suicidal and/or homicidal ideations (Exhibits 1F; 14F)."  R. 32; *see* R. 33 (referring to Exhibits 2F, 20F, and 24F).

The ALJ also considered the opinions of the non-examining medical consultants/psychologists Drs. Alexander (November 2010) and Silver (July 2011), afforded their opinions "significant weight," although noting that their opinions did not carry the same weight as examining or treating physicians.  R. 34-35; *see* R. 29.  The ALJ also considered the opinions of Dr. Franklin who performed a consultative examination in November of 2010.  R. 32-34.  Notwithstanding his diagnosis of attention

deficit disorder and history of decreased bilateral hearing loss and other diagnoses, the ALJ noted that Dr. Franklin "otherwise indicated that the claimant had a normal ability to hear and understand and conventional speech despite his underlying hearing impairment (Exhibit 15F)." R. 32; *see* R. 454.

Although the check-mark questionnaires of Drs. Smith and Suss support the Plaintiff's position, substantial evidence otherwise supports the ALJ's determination at step two, as well as his determination at step three that Plaintiff has mild limitations in his activities of daily living[20] and in social functioning, mild limitations in his ability to maintain concentration, persistence or pace, and no episodes of decompensation. R. 28-30.

### B.  Substantial Evidence Supports the ALJ's RFC Assessment

Plaintiff argues that the ALJ's RFC determination is flawed.  Doc. 15 at 16-18. Closely linked is Plaintiff's argument that the ALJ's step four determination, that Plaintiff can perform (as defined and generally performed) his past relevant work as a short order cook is likewise flawed.  Doc. 15 at 18-22.  The latter issue is discussed under section C, *see infra* at 51-54.

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  R. 27.  To reach this determination, the ALJ evaluated several listings and found the medical evidence did not "document listing-level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment."  R. 28.  "In making this finding, [the ALJ] evaluated the

---

[20]  In his July 2010 evaluation, Dr. Smith noted that Plaintiff "reported no restriction in any activities of daily living."  R. 346.

claimant's attention-deficit/hyperactivity disorder; depression; anxiety; [PTSD]; anti-social disorder; borderline intellectual functioning ; marijuana dependence; and cocaine dependence in accordance with the special technique described in 20 CFR 404.1520(a) and 416.920(a)."  R. 28.  The ALJ considered the degree of Plaintiff's limitations in light of the "broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings."  *Id.*

The ALJ determined that Plaintiff had mild restrictions in *activities of daily living*. *Id.*  The ALJ compared statements made to Dr. Smith in July 2010, R. 346, in which Plaintiff reported "no restriction in any activities of daily living" with statements made by Plaintiff and Mr. Cable in October 2010 (Exhibit 5E) and by Mr. Cable in March 2011 (Exhibit 10E), R. 235-36, 261-62, that Plaintiff needed help in managing daily activities of daily care, hygiene, and grooming.  R. 28.  The ALJ found these statements were inconsistent and undermined Plaintiff's credibility.  *Id.*  The ALJ also relied on the opinions of non-examining psychological consultants, Drs. Alexander and Silver, who concluded in November 2010, R. 459, and October 2011, R. 518, respectively, that Plaintiff's mental impairments are non-severe.  R. 28.

In addition to the function reports mentioned above, on September 22, 2010, Mr. Cable completed a third-party function report.  R. 226-33 (Exhibit 4E).  This report is mentioned by the ALJ who afforded it "little weight."  R. 36.  The September and October 2010 reports are somewhat consistent regarding Plaintiff's ability for personal care, which generally was reported as no problem, *see, e.g.*, R. 227-28, 235-36; getting around/going outside, R. 229, 237; social activities, including not getting along with his father, R. 230, 238; and use of a wheelchair, a cane, and glasses, R. 232, 240.

Mr. Cable reported more problem areas regarding Plaintiff's abilities in September than reported by both in October. R. 231, 239. For example, items such as sitting, kneeling, talking, seeing, memory, concentration, understanding, and following instructions are not checked on the October form. R. 231, 239. Mr. Cable reported on the September form that Plaintiff can pay attention for only 30 minutes, whereas he reported that Plaintiff watches television for two hours on the October form. *Id.* Problems related to Plaintiff's legs and feet are described in both reports. *Id.*

On the March 2011 form (Exhibit 10E), Mr. Cable reported what appears to be a deterioration in Plaintiff's condition. R. 260-67. For example, in the March 2011 form, Mr. Cable reported that Plaintiff needs help with personal care, R. 261; Plaintiff did not prepare his own meals, R. 262; Plaintiff did not go outside because he cannot walk well- his "leg hurts so much," R. 263; Mr. Cable did the shopping, *id.*; Plaintiff no longer had any hobbies, although he watches television, R. 264; he continued to talk with his mother but less frequently, *id.*; he had additional problems with his abilities when sitting, kneeling, using his hands, and understanding, *id.* He no longer walked well and then for only two minutes, *id.*; he no longer got along with others, R. 265; and he used a hearing aid in addition to a wheelchair and cane, R. 266.

The ALJ determined that Plaintiff's social functioning was only mildly impaired based on his comparison of the responses in the October 2010 and March 2011 function reports with Plaintiff's hearing testimony. R. 29. The ALJ also considered the same opinions of Drs. Alexander and Silver. R. 28-29.

The ALJ considered Plaintiff's allegations with regard to concentration, persistence and pace and found that he was only mildly impaired, relying on part of

Dr. Smith's evaluation regarding Plaintiff's mental status and consideration of

Mr. Cable's March 2011 function report when he did not report that Plaintiff had difficulty

remembering, understanding, concentrating and/or following instructions and reporting

Plaintiff's ability to pay bills (sometimes) and count change.  R. 30, 263, 265.  The ALJ

also relied on the opinions of Drs. Alexander and Silver.  R. 30.

The ALJ also found, without contradiction, that Plaintiff had no episodes of

decompensation of extended duration.  R. 30.

Based on the above analysis, the ALJ determined that Plaintiff does not have any

impairments that medically meet or equal a listing, and Plaintiff does not argue that the

ALJ erred at step three.  Doc. 15 at 13-25.

The ALJ next assessed Plaintiff's RFC.  The RFC represents the most the

claimant can do despite his limitations and is based on all the relevant record evidence.

20 C.F.R. § 404.1545(a).  This includes the objective medical evidence, 20 C.F.R.

§ 404.1529(a),[21] the medical opinions, 20 C.F.R. § 404.1527(b), and the statements of

others about the claimant's medical history, diagnosis, prescribed treatment, daily

activities, efforts to work, and any other evidence showing how the claimant's

impairments and related symptoms affect her ability to work.  20 C.F.R.

§ 404.1529(a).  In considering the medical opinions, the ALJ should consider several

factors.  20 C.F.R. § 404.1527(c).

The ALJ considered, among other evidence, the October 2010, R. 234-41

(Exhibit 5E), and March 2011, R. 260-67 (Exhibit 10E), function reports; several

disability reports, R. 210-25, 249-54, 276-82 (Exhibits 2E, 8E, and 14E); and the

---

[21]  Although the ALJ did not expressly refer to the three-part part standard, it is clear that the ALJ's findings, discussion, and citation to 20 C.F.R. §§ 404.1529, 416.929, R. 30, indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226.

hearing testimony. R. 31-32. In short, the ALJ considered Plaintiff's physical and mental limitations and his medications. *Id.* The ALJ concluded that "[t]he objective medical evidence of record does <u>not</u> support the claimant's allegations regarding the intensity, persistence, and limiting effects of his symptoms." R. 32. The ALJ reiterates the "numerous inconsistent statements" made by Plaintiff, "including but not limited to [Plaintiff's] assertion at the hearing level that his roommate [Mr. Cable] completes most activities for him." R. 32. The ALJ did not believe Plaintiff and Mr. Cable regarding the extent to which they stated Plaintiff was disabled. *Id.*

Notwithstanding, the ALJ considered medical evidence of record, most of which is set forth herein, R. 32-33, and included the July of 2010 evaluation of Dr. Smith and December 2011 evaluation of Dr. Suss and their questionnaires (medical source statements). R. 32-36. After considering the medical evidence, the ALJ made the following observation:

> Inconsistent reports and testimony from the claimant and the fact that the record contains observations of generally stable examination findings, with some improvement in condition when compliant with conservative treatment, detract from the credibility of the claimant's allegations as to his functional limitations in the severity of his alleged symptoms. While the above referenced inconsistencies may not have been the product of a conscious attempt to mislead on the part of the claimant, they nonetheless undermine the credibility of his allegations in reporting activities of daily living and functional abilities. Accordingly, the undersigned finds the claimant's allegations are not entirely credible pursuant to Social Security Ruling 96–7p.
>
> Pursuant to 20 CFR 416.927 and Social Security Rulings 96–6p and 96-2p, the finding above is supported by reports from treating and examining physicians, as documented in the medical evidence of record. The undersigned has considered these medical source reports, along with opinions from non-examining State agency consultants, in the undersigned evaluation of the claimant's functional limitations and weighed them above and below accordingly. The record also contains opinions from sources not considered "acceptable medical sources," which the undersigned has duly considered pursuant to Social Security Ruling 06-03p.

R. 34.

The ALJ then considers, in greater detail, the opinions of Drs. Alexander and Silver, *see supra* at 26-27, 29, R. 34; Dr. Jeffcoat, *see supra* at 27, R. 35; Dr. Tashjian, *see supra* at 29, R. 35; the medical source statements of Drs. Smith and Suss, *see supra* at 23 n.14, 30-33, R. 35-36; and the medical source statement from Dr. Ratchford, *see supra* at 23, R. 36.  The ALJ also expressly considered the statements of Mr. Cable "to the extent they are considered an opinion of the claimant's functional limitations (Exhibit 4E)." (Exhibit 4E is Mr. Cable's third-party function report filled out on September 22, 2010.  R. 36; *see supra* at 11-13.)  The ALJ afforded Mr. Cable's statement "little weight due to [his] lay status, as a non-medical source, the statements inconsistency with the overall evidence of record received at the hearing level, and [his] perceived bias in acquiring benefits for his roommate."  R. 36.

Ultimately, the ALJ concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), "except he requires a sit and/or stand option; he can sit for no more than 1 hour at a time; he cannot climb ladders, ropes and/or scaffolds; and he cannot be exposed to unprotected heights and dangerous machinery."  R. 30.  Overall, substantial evidence supports the ALJ's RFC assessment particularly in light of his credibility findings regarding Plaintiff and Mr. Cable.

### C. Substantial Evidence Does Not Support the ALJ's Step Four Determination

At step four, the ALJ determined that Plaintiff is capable of performing past relevant work as a short order cook.[22] R. 36. The ALJ found, "[c]onsistent with conclusion of Disability Determination Services upon reconsideration," that Plaintiff "is able to perform the physical and mental demands of his previous work as actually and generally performed (Exhibits 6E; 12E)." R. 36.

The ALJ referred to DOT# 254.29-5047. *Id.* A review of the Dictionary of Occupational Titles, Fourth Edition, Revised 1991 (DOT), does not reveal any job under this number. The DOT number 254 series generally refers to sales occupations such as printing and advertising. DOT number 313.374-010 refers to "cook, fast food (hotel & rest.)" with alternate titles and DOT number 313.374-014 refers to "cook, short order (hotel & rest.)."

At step four, the ALJ referred to Exhibit 12E, a vocational analysis completed by Chaterica N. Williams on August 1, 2011, which cited to a description of DOT number 313.374-014, R. 272. R. 36. This job description states:

> Prepares food and serves restaurant patrons at counters or tables: Takes order from customer and cooks foods requiring short preparation time, according to customer requirements. Completes order from steamtable and serves customer at table or counter. Accepts payment and makes change, or writes charge slip. Carves meats, makes sandwiches, and brews coffee. May clean food preparation equipment and work area. May clean counter or tables. *GOE: 05.10.08 STRENGTH: L GED: R3 M2 L2 SVP: 3 DLU: 81.*[23]

---

[22] Plaintiff has the burden to prove at step four that he cannot perform past relevant work. *See supra* at 5-6.

[23] Semi-skilled work corresponds to an SVP of three and four. Social Security Ruling 00-4p, 2000 SSR LEXIS 8, at *8 (December 4, 2000). A job is included in the light work category "when it requires a good deal of walking or standing, or when it requires sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

Exhibit 6E is a vocational analysis worksheet prepared by examiner, not vocational

examiner, Emily Graves on January 21, 2011.  R. 242-44.  In the analysis portion of

Ms. Williams' assessment, there are several questions, three of which are relevant.

> Claimant can do past work by *their* description          /No
> Claimant can do past work as described in the DOT   /Yes
> Claimant can do past work of: Cook, Short Order

R. 271 (emphasis added).

In a September 1, 2010, disability report, it is stated that Plaintiff worked as a

cook (fast food and family dining restaurants) in various places in the last 15 years, from

1995 to April 2010; he worked eight hours a day, six days a week; he used machines,

tools, or equipment; used technical knowledge or skills, but did not do any writing,

complete reports, or perform any duties like this.  R. 213.  He would walk two hours;

stand for six hours; *not* sit, climb, stoop (bend down and forward at the waist), kneel

(bend legs to rest on knees), crouch (bend legs and back down and forward), crawl

(move on hands and knees), or handle large objects for any amount of time each day.

He would write, type, or handle small objects for eight hours a day and reach for two

hours a day.  He would lift and carry various food products such as canned goods,

bottles of oil, and bags of potatoes.  The heaviest weight lifted was 50 pounds and he

frequently lifted less than ten pounds.  He did not supervise anyone in this job nor was

he a lead worker.  R. 213; *see* R. 220 (September 1, 2010, work history report).

During the hearing, Plaintiff provided little information regarding his work as a

short order cook.  R. 71-72.  Other than telling Dr. Smith that he hoped "to get back into

the restaurant business," and other brief references that he worked as a chef and full

time, *see, e.g.*, R. 412-17, there is sparse information available that indicates how Plaintiff actually performed his job as a short order cook.

Based on the number of years that he performed as a cook, the ALJ properly found that Plaintiff has the acquired skills to perform this job *as defined*. R. 36. The ALJ found that Plaintiff is able to perform the physical and mental demand of his previous work *as actually and generally performed* citing to Exhibits 6E and 12E. R. 35. Substantial evidence supports his conclusion that Plaintiff is able to perform as a short order cook as generally performed, but not as actually performed. The ALJ does not explain how a sit/stand option (for the RFC) translates to Plaintiff being able to stand for six hours and walk for two hours with no sitting in an eight-hour workday when performing his job as a short order cook in the future. Although Drs. Jeffcoat and Tashjian opined that Plaintiff can stand and/or walk about six hours in an eight-hour day, R. 35, they do not describe how many hours Plaintiff can stand with a sit/stand option while working as a short order cook. Also, as noted by Plaintiff, part of the evidence cited by the ALJ supports a conclusion that Plaintiff could not perform his past work as a short order cook as described. R. 271 (Exhibit 12E).[24]

It is respectfully recommended that this case be reversed and remanded to the Commissioner for reconsideration at step four of the sequential evaluation process and consideration of additional evidence if necessary, including but not limited to consultation with a vocation expert[25] in order to complete the step four analysis and at step five if appropriate. No recommendation is made whether Plaintiff is disabled.[26]

---

[24] Although his opinion was afforded "little weight," Dr. Ratchford opined that Plaintiff would be capable of sitting eight hours, standing two hours, and walking two hours in an eight-hour workday. R. 36, 441.

## V. Conclusion

Considering the record as a whole, substantial evidence does not support the findings of the Administrative Law Judge at step four. Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **REVERSED** and this case be **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on February 5, 2014.

<u>s/ Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

---

[25] "A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's part relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work." 20 C.F.R. § 404.1560(b)(2). A vocational expert or specialist may also offer expert opinion testimony in response to a hypothetical question whether a claimant's limitations imposed by the claimant's impairments can meet the demands of the claimant's previous work, either as actually performed or as it is generally performed in the national economy. *Id.*

[26] In light of the recommendation made herein, it is unnecessary to consider whether Plaintiff's "new evidence" warrants a different disposition. *See* doc. 15 at 24-25.